**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION**

| | | |
|---|---|---|
| Toni C. Bowen, | ) | Civil Action No. 8:09-CV-2694-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

On October 15, 2009, Plaintiff Toni C. Bowen filed the within action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, as amended (the "Act") seeking judicial review of a final decision of Defendant Commissioner of Social Security Administration (the "Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Bruce Howe Hendricks for pretrial handling. After receiving two extensions of time, Plaintiff filed her brief addressing the substantive issues in this case on August 6, 2010. ECF No. 30. On September 20, 2010, the Commissioner filed a Memorandum in support of its decision denying Plaintiff's claims. ECF No. 34. Plaintiff did not file a response to the Commissioner's Memorandum and, on December 28, 2010 the Magistrate Judge issued a Report and Recommendation ("R&R") recommending that the Commissioner's decision to deny Plaintiff's claims be affirmed. ECF No. 37. On January 28, 2011 Plaintiff filed a 34-page brief objecting to the R&R and seeking either an award of benefits or, in the alternative, a remand of the case for a rehearing before a different Administrative Law Judge ("ALJ") than the one

that heard and denied Plaintiff's claims.  See Pl's Obj. 34, ECF No. 42.  The Commissioner responded to Plaintiff's objections on February 10, 2011.  ECF No. 44.

The Magistrate Judge makes only a recommendation to this Court.  The recommendation has no presumptive weight.  The responsibility for making a final determination remains with this Court. Mathews v. Weber, 423 U.S. 261, 270 (1976).  The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).  The Court is obligated to conduct a de novo review of every portion of the Magistrate Judge's report to which objections have been filed. Id.  For the reasons set forth below, the Court adopts the R&R and affirms the decision of the Commissioner.

## I. FACTS

Plaintiff alleges that she is disabled "due to chronic widespread pain, fibromyalgia, significant fatigue, disturbed sleep, . . . vocal cord dysfunction, patellofemoral syndrome, muscle atrophy of the knees[,] and depression."  Pl.'s Br. 2, ECF No. 30.  Plaintiff protectively filed her current applications for DIB and SSI on November 27, 2006,  alleging disability beginning on November 8, 2006.  See R. 10.  Plaintiff's applications for DIB and SSI were denied initially and again upon reconsideration.  See R. 69–70, 81–86.  Plaintiff requested a hearing and her case was assigned to an ALJ.  The ALJ held a de novo hearing on Plaintiff's applications on March 6, 2009. See R. 22–55.  On April 28, 2009, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Act.  See R. 10–21.  Plaintiff sought review of the ALJ's decision from the Appeals Council, which denied that request in a notice dated August 19, 2009. See R. 1–3. Because the Appeals Council denied Plaintiff's request for review, the ALJ's decision

2

became the Commissioner's final decision for purposes of judicial review.

**A.    Plaintiff's Medical Records**

Plaintiff's medical records are extensive.  Below, the Court summarizes those records that appear relevant to Plaintiff's claims.  Plaintiff's problems reportedly began in early 2003, "after an esophagogastroduodenoscopy when she began experiencing spasms bilaterally, most significantly in the feet and hands.  She also describes . . . a twitching of the eyelids bilaterally, which would interfere with her vision. . . .  She also felt short of breath and described some tight feeling in her throat."  R. 234.[1]  That year, Plaintiff had a neurological examination, nerve conduction study, and an eletromyography ("EMG"),[2] all overseen by a Dr. Cunningham and all of which, according to Dr. Cunningham's notes, were normal.  R. 234.  Plaintiff also "had an MRI of the brain, cervical spine, lumbar spine, lumbar puncture, and a sleep study, all of which were reportedly normal."  R. 234.  In October 2003, Plaintiff saw Dr. Benjamin R. Millar, M.D. who conducted another nerve conduction study and found "some mild slowing in the median and ulnar sensory nerves."  R. 234.  Also, sometime during 2003, Plaintiff saw a Dr. Lipsey "for possible rheumatalogical condition or fibromyalgia[.]"  R. 234.  Dr. Lipsey "conducted blood tests, . . . includ[ing] thyroid function tests, serum protein electrophoresis, B-12, angiotensin converting enzymes, aldolase, creatinine kinase, ANA, ENA, acetycholine receptor antibody panel and hepatitis panel, all of which were normal."  R. 234.

Beginning in 2004, Plaintiff complained that,

---

[1]    An esophagogastroduodenoscopy ("EGD") is a test that examines the lining of the esophagus, stomach, and upper duodenum with a flexible endoscope.

[2]    An EMG is a test that assesses the health of muscles and related nerve cells.

her voice has been shaky and her right side feels weak and has a tremor. If she uses a lot of force, she will notice the tremor when writing or grasping with strength. . . . she describes trembling at rest. Her teeth chatter and her tongue shakes, and she has been complaining of insomnia and flu-like achy pain.

R. 234. On November 23, 2004 Plaintiff had a speech assessment, "which showed decreased initiation of movement with a laryngeal range of motion that was 'inconsistent' . . . . 1 out of 5 trials resulted in aspiration of water." R. 234. She saw a Dr. Waters on January 3, 2005, "who identified paradoxical vocal cord movement and abduction with a breathy voice with [Plaintiff's] speech, and this raised a question of psychogenic speech." R. 234. Plaintiff was also seen at the Medical University of South Carolina ("MUSC") on January 11, 2005, "and they described swallowing problems, but there was no explanation of cause." R. 234.

On March 17, 2005 Plaintiff was evaluated by Dr. Anthony C. May, M.D. at Absher Neurology for Parkinson's Disease or ALS. R. 234. After examining Plaintiff, Dr. May opined that he could not exclude the possibility of mild dystonia, "which could be producing some of the irregular involuntary movements [that Plaintiff] described," and "it is also conceivable that she has simply . . . a variant of essential type tremor, which does run in her family." R. 235.[3] However, Dr. May also wrote that "[m]any of her other complaints . . . I believe are of a psychogenic nature, and there are features of her exam that are embellished. As to some of her non-neurological complaints, these must be held in suspicion, given the other psychogenic features of her story and examination."

---

[3]     Dystonia is a neurological movement disorder that causes muscles to contract involuntarily and for sustained periods of time and which can result in twisting movements or a distorted posture or appearance. Symptoms can include tremors, a dragging leg, cramping in the foot, uncontrollable blinking, facial or jaw spasms, slurred speech or difficulty swallowing, and impaired handwriting. An essential tremor is a neurological movement disorder characterized by a slowly progressive involuntary rhythmic movement of a part or parts of the body.

4

Id.  Dr. May concluded that "[i]t is certainly worthwhile to repeat her brain MRI, and I will try to obtain additional records."  R. 235.  He also planned to attempt to treat Plaintiff's tremor with Artane, "which is useful for dystonia and dystonic tremor," and recommended a follow up in six weeks.  R. 235.  On April 15, 2005, Plaintiff's brain MRI was repeated.  It revealed nothing abnormal.  R. 303.  On June 6, 2005, Plaintiff saw Dr. May for a follow-up.  Plaintiff reported that increasing Artane had been helpful for her tremor and that it "has improved to the point now where [Plaintiff] is able to work again."  R. 237.

On November 29, 2005, Plaintiff was seen by Dr. Naveen R. Saxena, M.D. at the Internal Medicine & Cardiology Center in Greenville, South Carolina for a follow-up evaluation regarding Plaintiff's complaints of chest pains and palpitations.  Dr. Saxena's examination yielded no abnormal results.  R. 279.

On January 4, 2006, Plaintiff was referred to Dr. Michelle M. Reeves by Dr. Saxena for an eye examination to investigate Plaintiff's complaints of blurred vision.  R. 353.  Approximately one week later, on January 13, 2006, Plaintiff returned to see Dr. Saxena complaining of "blurred vision, off-balance, [and] review of meds."  R. 280.  Per Dr. Saxena's records, Plaintiff was then taking ten medications, including Klonopin, Artane, and Clonazepam.  R. 280.[4]  Plaintiff was given a B-12 injection and told to return in one week.  R. 281.  On January 16, 2006, Plaintiff saw Dr. Reeves for a comprehensive eye examination to investigate her complaints of "poor focusing" and "floaters."  R. 364, 365.  Dr. Reeves found that Plaintiff's "ocular health appears unremarkable," but noted that Plaintiff's "visual field, vague complaints of blurred vision, and mild red desaturation . . . are signs

---

[4]     Klonopin is an anticonvulsant that may be used to treat epilepsy and panic attacks. Clonazepam is a benzodiazepine, which may be used as a muscle relaxant, to control seizures, and to relieve panic attacks.

of retrobulbar optic neuritis . . . [which] will require continued follow up." R. 364.[5]

On February 3, 2006, Plaintiff was again seen by Dr. Saxena for complaints of eye problems, including blurred vision that reportedly began one month earlier. R. 269. On February 10, 2006, at the request of Dr. Saxena, Plaintiff was seen in consultation at MUSC by Dr. Zhongzeng Li, M.D. for complaints of "generalized weakness for 3 years and blurry vision for one month." R. 259. Plaintiff's neurological examination was normal. R. 261. However, because all of Plaintiff's prior MRIs were conducted before the onset of Plaintiff's complaints of blurry vision, Dr. Li ordered another brain MRI "with and without contrast to look for enhancement in the brain or optic nerve," as well as "visual evoked potential to assess optic nerve function[.]" R. 261. Plaintiff submitted to both tests and both were reported to be normal. R. 263.

On March 15, 2006, Plaintiff was again seen by Dr. Saxena, this time for complaints of back pain. R. 275. Dr. Saxena's records regarding this visit include a note that Plaintiff recently had the flu and that her "back pain is increasing" and "[s]ymptoms worsen with certain movements." R. 275. Dr. Saxena prescribed Medrol, which is used to treat inflammation, and Flexeril, a muscle relaxant. R. 276. On March 24, 2006, Plaintiff saw Dr. Li for a follow-up. At this visit, Plaintiff advised that, "two weeks ago she had a flu and then developed right sided weakness which has persisted since then." R. 263. Dr. Li wrote that Plaintiff "also complains [of] burning/aching pain in the right arm and right leg" and of "memory difficulty." R. 263. Dr. Li conducted another neurological examination which, this time, "showed some weakness in the right arm and right leg

---

[5]      Optic neuritis results when the optic nerve becomes inflamed. It can cause rapid and progressive temporary vision loss. Retrobulbar optic neuritis occurs in the section of the optic nerve located behind the eyeball; it is often associated with multiple sclerosis.

with some giveaway components as well as decreased sensation in the right arm and right leg with

no sensory deficit at the chest level." R. 265. Dr. Li concluded that "I am not sure what condition

she has. But there is no evidence for multiple sclerosis at this time." R. 265.

On April 10, 2006, Plaintiff saw Dr. Saxena for complaints of "hand trouble, foot cramps,

and bruising on legs, back pain, [and] knee problems." R. 277. Plaintiff advised that,

> [She] has difficulty using [her] right hand. The hand turns purple and patient cannot
> relax or grip the fingers. She also has cramps in her toes. . . . The right knee feels
> weak when walking even short distances. Patient notes bruising all over body, but
> particularly on legs. She states that these bruises are due to stumbling into walls.

R. 277–78. Dr. Saxena referred Plaintiff to physical therapy. R. 278.

Two days later, on April 12, 2006, Plaintiff was seen at Riverside Family Practice by her

primary treating physician, Dr. Steve Hamberis, M.D. R. 312. Per Dr. Hamberis' notes, Plaintiff

reported that "[s]he feels like her right side is weak and she has some sort of drawing condition down

the right arm . . . she continues to have visual disturbances at times where her vision is blurry. . . ."

R. 312. Dr. Hamberis also wrote that Plaintiff had been to see neurologists at MUSC and Emory:

"No one has been able to really give her a diagnosis or a clue. They seem to think this is

psychosomatic. They are not quite sure that it is still not MS but all studies have proven that this is

not MS." R. 312. Dr. Hamberis noted that "we are going to send her for a 2nd opinion again to a

Francis Walker at Wake Forest." R. 312. Dr. Hamberis further advised that Plaintiff's "recent

opthamological evaluation appeared to be clear but she does have an appointment with Dr. Wolin

for possible neuro opthamological evaluation." R. 312. Dr. Hamberis conducted some liver function

tests and noted that Plaintiff appeared "to have some mild decreased strength on the right side

especially grip strength and she seems to be drawing up that hand somewhat but I can soften it up

7

just using my hand to manuever it." R. 312.

On April 19, 2006 Plaintiff had an initial evaluation with Victor Cortina, a physical therapist at Magnolia Medical Group, Inc. R. 493. The evaluation described Plaintiff's chief complaints as "right knee instability–general leg weakness, right hand paralysis, [and] low back pain," with an onset date of three years earlier. R. 493. The recommended treatment plan was physical therapy three times a week for eight weeks. R. 495. On April 23, 2006, Plaintiff had her next physical therapy appointment, at which she was provided with an offset straight cane to address her complaints of knee pain and instructed in its use to decrease knee stress. R. 491. Plaintiff had another physical therapy appointment the following day and reported that the use of the cane assisted her walking. R. 489. Plaintiff also indicated that "her hand functioning is improving; she is able to oppose her third and fourth digits to her thumb." R. 489. The physical therapist observed that Plaintiff's "left knee control is markedly improved . . . [and she] demonstrates diminished knee hyperextension during ambulation." R. 489. On April 26, 2006 Plaintiff had another physical therapy appointment. The therapist recorded that "[Plaintiff] relates that hand function has improved markedly. She states that she notices that right knee hyperextension has diminished." R. 488. On April 28, 2006, Plaintiff again saw the physical therapist. Plaintiff continued to report that "she feels improvement with therapy." R. 485. Although Plaintiff "[c]ontinues to demonstrate mild hyperextension [movement]," the therapist advised that Plaintiff's "control . . . is improving with pain diminishing." R. 486.

At Plaintiff's next physical therapy appointment, on May 1, 2006, the therapist noted that Plaintiff continued to complain of right knee pain and advised that her knee continues to hyperextend. R. 483. Plaintiff "declined aerobic exercise component due to acute bronchitis," and

the therapist noted that a knee sleeve would be ordered to address Plaintiff's complaints about hyperextension.  R. 484.  On May 3, 2006, Plaintiff presented to Riverside Family Practice with complaints of a sore throat and cough that she said began three days earlier. R. 312.  Dr. Hamberis noted that Plaintiff had a regular heart rate and rhythm, clear lungs, and there appeared to be no infiltrate on the chest x-ray.  R. 312.  He sent Plaintiff's x-ray to a radiologist who concluded that Plaintiff had a  "radiographically normal chest."  R. 331.   On May 8, 2006, Plaintiff was seen in consultation by Dr. Mitchell J. Wolin, M.D. at the Center for Advanced Eye Care for "complaint of neurologic problems affecting her right side as well as blurry vision." R. 363.  Dr. Wolin conducted an examination, which "showed generalized decrease in the right eye, but non-specific." Dr. Wolin described the rest of Plaintiff's exam as "unremarkable."  R. 363.  He concluded:

> Non-specific field defects.  Visual acuity was somewhat improved with a change in prescription.  No definitive sign of optic neuritis.  I do not have any specific explanation for her mild defects in the right eye on her field test.  I have asked her to return in 6 months for recheck of this.

R. 363.  That same day, Plaintiff had her first physical therapy appointment after a week of absence that she appears to have attributed to having acute bronchitis.  The physical therapist reported that Plaintiff was "fatigued" but the session was "well tolerated."  R. 481.  They discussed Plaintiff's right knee hyperextension problem and the therapist noted that Plaintiff would be referred to an orthotist for fitting of bracing.  R. 481.  Two days later, Plaintiff had another physical therapy appointment. The session notes provide that, "[r]ight knee hyperextension continues to be a problem despite improvement in right quadricep eccentric control."  R. 479.  On May 12, 2006, Plaintiff had another physical therapy appointment.  The therapist made the same general notes as per the previous session.  R. 478.  Plaintiff saw the physical therapist again on May 15, 2006.  At that visit, the

therapist noted that "[Plaintiff] complains of medial knee pain indicating that she did limited shopping with her daughter this weekend. The right medial knee appears mildly inflamed." R. 475. The therapist concluded that, "[k]nee stability continues to be problematic," and noted that Plaintiff "was advised regarding use of straight cane to decrease right knee stress." R. 475. Plaintiff attended physical therapy appointments on May 17, 19, and 22. R. 469–73. At her appointment on May 22, 2006, Plaintiff reported "diminished right knee discomfort but still painful." R. 469. On May 24, 2006, Plaintiff was fitted with right knee brace and indicated that "she feels significant relief." R. 467. Plaintiff was discharged from this round of physical therapy on May 26, 2006. R. 465. At her final appointment, Plaintiff continued to report improvement, advising that "[the] brace is functioning well" and "she is not using her cane anymore." R. 465.

On June 1, 2006, Magnolia Medical Group, Inc. conducted another physical therapy initial evaluation for Plaintiff at Dr. Saxena's referral. R. 455. Per the evaluation, the chief complaints sought to be addressed were "[d]ecreased function of B UEs with decreased ROM/strength and increased pain with occupational activity." R. 455.[6] Plaintiff advised that her work as a graphic designer required her to complete tasks with a high level of coordination and dexterity and that "[l]imitations in [dominant] hand [are] causing majority of work related difficulties." R. 455. The physical therapist's recorded observations included the following:

> [Plaintiff] is a motivated individual attempting to maintain full time employment despite obvious limitations in function. [Plaintiff] with internal rotation of R shoulder accompanied by scapular depression d/t decreased musculature of R shoulder complex. [Plaintiff] with mild to moderate tremor with repetition of functional activity engaging, muscles of the shoulder complex, upper arm, lower arm, wrist, and hand d/t quick muscle fatigue with gravity resistive activity. [Plaintiff] wearing R

---

[6]    "B UEs" appears to be shorthand for "both upper extremities," and "ROM" shorthand for "range of motion."

> knee brace for stabilization and prevention of hyperextension d/t poor muscle control
> of quadriceps and hamstrings.

R. 456.  After conducting muscle testing, the physical therapist concluded that "[b]oth intrinsic and

extrinsic hand muscles are unable to tolerate sustained contraction yielding hyperextension of DIP

joints and stiffening/tightening/fatigue of the hand."  R. 457.  The assessment concluded that

Plaintiff had a decrease in functional status with "subjective and objective deficits that can be

addressed by occupational therapy intervention."  R. 457.  Specifically, Plaintiff's problems were

listed as: "[i]ncreased time required for ADL completion," "[i]ncreased time required and decreased

skill demonstrated during work tasks," "[d]ecreased strength of R UE," "[d]ecreased

coordination/dexterity of R hand," and "[i]ncreased pain in R UE."  R. 457.  The physical therapist

rated Plaintiff's potential to reach her physical therapy goals as "[g]ood," noting that Plaintiff has

"high level of adaptation and motivation."  R. 457.

On June 6, 2006, Plaintiff was seen by Dr. Hamberis for complaints of "bilateral back

pain[.]"  R. 311.  Dr. Hamberis notes that Plaintiff "is on Neurotin for the strange sometimes

neuropathic problems she has which she states it is helping only a little bit."  R. 311.  Dr. Hamberis

noted that Plaintiff exhibits "[p]retty good strength, sensation, reflexes in upper and lower

extremities," and "[g]ait appears to be within normal limits."  R. 311.  On the same day, Plaintiff saw

her physical therapist for the first time since the initial assessment on June 1, 2006.  In the interim,

Plaintiff had cancelled an appointment.  See R. 453.  The therapist noted that Plaintiff "had difficulty

with completion of exercise, secondary to pain levels."  R. 453.

On June 7, 2006, Plaintiff had EMI CT scans of her abdomen and pelvis, ordered by Dr.

Hamberis in response to Plaintiff's complaints about bilateral back pain. R. 299.  The tests revealed

a large cyst or aggregation of cysts arising from the right ovary. R. 299. It was recommended that a pelvic ultrasound be done for better characterization. R. 299. Plaintiff had a pelvic ultrasound on June 8, 2006 at Greenville Hospital. R. 298. The result was a "simple appearing cyst in the right adnexa," with "no complicating features at this point." R. 298.

On June 27, 2006, Plaintiff had another physical therapist appointment, following another cancellation. R. 451. At the appointment, Plaintiff apologized, explaining that she had been on vacation and had surgery for her ear. R. 451. She complained that "everything hurts and is sore." R. 451. The physical therapist noted that Plaintiff "[t]olerated" the session "with decreased symptoms and increased function." R. 451. Plaintiff next saw the physical therapist on June 29, 2006. R. 449. At that session, Plaintiff advised that she was feeling a little better since her last visit and told the physical therapist that "[w]hat you did for my arms and feet helped." R. 449. The therapist's notes for the session report that Plaintiff "[t]olerated [the session] with decreased symptoms and increased function. [M]anual tx to forearm and volar arches in feet with decreased abnormal spasming." R. 449. On June 30, 2006, Plaintiff saw Dr. Reeves again for an eye examination. R. 358.

On July 6, 2006, Plaintiff had another physical therapy appointment. R. 447. Plaintiff complained that her "[r]ight shoulder and arm worst problem right now (besides my right leg)." The physical therapist's session notes indicate that Plaintiff "[t]olerated [the session] with decreased symptoms and increased function. [M]anual tx to forearm and volar arches in feet with decreased abnormal spasming." R. 447. Plaintiff's next visit was on July 11, 2006, at which she reported that her shoulders were "hurting more than anything today," but she is "doing better overall." R. 445. As on the last several visits, the physical therapist's notes indicate that Plaintiff tolerated the session

"with decreased symptoms and increased function." R. 445. Plaintiff next saw the physical therapist on July 25, 2006, at which visit Plaintiff complained that "[t]remoring and other hand symptoms are worse this week and my knees [have] been bothering me." R. 444. The therapist's assessment, however, was the same as the previous session: "[t]olerated with decreased symptoms and increased function[.]" R. 444.

On August 1, 2006, Plaintiff was evaluated at the Wake Forest University Baptist Medical Center's Movement Disorder Clinic in Winston-Salem, North Carolina, "concerning her multiple neurologic difficulties." R. 289. The resulting report summarized Plaintiff's complaints as follows:

> [A]pproximately three or four years ago, [Plaintiff] developed the onset of difficulty swallowing, first with solids with progression to liquids and pills. . . . At about the same time, she also developed difficulty with balance in multiple muscle groups in her arms and legs, weakness which was usually generalized with episodes of intermittent asymmetric extremity weakness, heavy feelings in her arms bilaterally, twitching of multiple muscles of all extremities, unwanted movements, muscle spasms, difficulty walking secondary to problems with coordination which she calls a "lateral walk," face, nose and eye twitching, and difficulty with intentional smile. . . . [She reports] an episode of numbness and inability to move her arms and legs which began initially in her feet and ascended up to her arms over the course of a night. . . . This numbness has persisted in her bilateral feet and continues intermittently today. She also has developed a tremor in her hands, which she states is worse on the right than the left, and began in June of 2005. She states that this is present both at rest and with activity intermittently and is particularly noticeable when she attempts to adduct her fingers. She was initiated on Artane and feels that this may be helping her tremor slightly. . . . [She reports that i]n March, she began having difficulties with "clawing" of her right hand. She states she is unable to adduct the fingers on that hand without significant difficulties, and although she is able to grasp with her hand, she states that most of the time her fingers stay tonically extended. She was placed on Neurontin and feels that this may have helped with her tonic finger extension. Other symptoms with which she presents today include[] dropping objects which she is holding in her right and left hands, worsening of her handwriting which she states is messy, difficulty with temperature regulation, coldness in both fingers and toes, tongue numbness which began most recently in June of 2006, easy distractability and decreased attention, occasional and intermittent blurred vision, difficulty with her balance and hesitant slurred speech.

R. 289–90.  Plaintiff further reported that she works in graphic design in a family business six to seven hours per day, "but is having some difficulty secondary to her right hand 'clawing.'" R. 291. Plaintiff also stated that "she does require some help with new activities and that her Mom lives close and is able to help with these chores." R. 291.  Plaintiff was subject to a thorough neurological examination, which was "relatively unremarkable." R. 293.  The report concluded,

> These symptoms and her history are not consistent with any particular neurologic disease process including Parkinson's disease, essential tremor, Huntington's disease, myasthenia gravis, or neuronopathies.  In light of her multiple normal MRI scans as well as normal lumbar puncture, it is very unlikely that she has multiple sclerosis which has gone undiagnosed for greater than three years.  At this time, her presentation is quite atypical for any organic neurologic disease.

R. 293.  In sum, "[w]e do not see evidence of any underlying serious neurological disorder." R. 294.

Plaintiff had her next physical therapy appointment on August 3, 2006.  The therapist noted that Plaintiff tolerated the session "with decreased symptoms and increased function." R. 443.  On August 8, 2006, Plaintiff again went to physical therapy.  R. 441.  At this session, Plaintiff told the physical therapist that she was "having a really bad day[.]" R. 441.  Plaintiff reported that, "[m]y arms are shaky, especially the right one," and "I had a real hard time at work using my tools . . . [m]y boss even asked if I was okay several times because of the way I looked." R. 441.  As for the session, the therapist wrote that Plaintiff "had difficulty with completion of exercise, secondary to pain levels." R. 441.  Plaintiff's "[r]ight arm skin tone redder than usual with extremely cold hand/digits right hand," and the "[o]verall appearance of patient today was poor with increased tremoring/pain/eyesight." R. 441.

The next day, Plaintiff saw Dr. Hamberis at Riverside Family Practice.  R. 311.  Plaintiff reported that "now she has numbness in her right upper extremity." R. 311.  Per Dr. Hamberis'

14

notes, as of this date, Plaintiff was taking Synthroid, Singulair, Prevacid, Neurotin, Klonopin, and Loestrin with iron.[7]  Dr. Hamberis concluded that he would repeat the nerve conduction studies on Plaintiff's upper extremities and suggested a blood panel for further evaluation.  R. 311.  He also noted that he would refer Plaintiff to Dr. Wolin for "[v]isual disturbance."  R. 311.  Dr. Hamberis' notes from this visit conclude:

> Disability.  I feel that the patient definitely has reason for this.  I do not know if this is associated with some sort of psychiatric issue.  We are not able to fix a diagnosis for this patient but I am concerned that she will not be able to work secondary this to affecting for the most part memory, concentration, voluntary and involuntary muscle use.  If blood tests come back within normal limits, I do not know where to go next as I feel like the workup has been for the most part complete and thorough.

R. 311.

On August 10, 2006, Plaintiff had another physical therapy appointment.  R. 439.  At that visit, Plaintiff told the therapist that her doctor was "going to order some more tests to compare to earlier ones," but that "I told him that whatever we do, I don't want to stop therapy because you have been helping ease the pain and symptoms in my right arm."  R. 439.  As for the session, the therapist noted that Plaintiff "had difficulty with completion of exercise, secondary to pain levels," her skin tone on her right arm was "redder than usual with extremely cold hand/digits right hand," and the "[o]verall appearance of patient today was poor with increased tremoring/pain/eyesight."  R. 439.

 Plaintiff's next physical therapy appointment was on August 17, 2006.  R. 437.  Plaintiff told the physical therapist that all tests had come back negative, "so they still don't know what's wrong with

---

[7]     Synthorid is typically used to treat hyperthyroidism; Singulair is typically used to treat asthma and/or allergies; Prevacid treats certain stomach and esophagus problems such as acid reflux and ulcers; Neurotin has many uses, including as an anticonvulsant for epilepsy patients and a treatment for certain types of nerve pain; and Loestrin is an oral contraceptive.

me." R. 437. Still, Plaintiff reported decreased pain and "[h]and symptoms are overall improved with better circulation and decreased tremoring." R. 437. Plaintiff attended physical therapy again on August 22, 2006. R. 435. At that appointment Plaintiff reported that she "had a slip and fall in my living room a few weeks ago," and that "[m]y back is hurting me especially on the lower right side and my left ankle is hurting a lot." R. 435. The therapist noted that Plaintiff's "[h]and symptoms are overall improved with better circulation and decreased tremoring. Back and left ankle with lower pain and improved function s/p tx." R. 435. On the following day, August 23, 2006, Plaintiff saw Dr. Hamberis for complaints of back pain. R. 310. Dr. Hamberis ordered an x-ray, which a radiologist at Greenville Radiology concluded was "entirely consistent with degenerative disc disease[.]" R. 322. Plaintiff saw her physical therapist again on the following day, August 24, 2006. R. 433. At that visit, Plaintiff complained that "[m]y back is killing me," but "[m]y ankle is feeling some better today since doing the ice/ace wrap/and stretches like you advised." R. 433. The therapist noted that Plaintiff's "[h]and symptoms are overall improved with better circulation and decreased tremoring in right hand," and "[l]eft ankle presents with decreased [swelling] upon inspection." R. 433. On August 31, 2006, Plaintiff had another physical therapy appointment, at which she advised that "[m]y hand is still doing a little[] better with the treatments you gave me." R. 431. Per the therapist's assessment, Plaintiff had increased pain from a fall that was being followed up by her physician, but her "[h]and/digit posturing during AROM and grasping displays a more stable lumbrical base of right RF/SF." R. 431. The therapist noted that Plaintiff had "[p]reviously displayed neurological dysfunction with MCP of RF/SF flopping inappropriately during grasping as well as atrophy of the volar/dorsal muscluature," but had demonstrated an "[i]mproving UE performance overall." R. 431.

16

On September 5, 2006, Plaintiff had another eye appointment with Dr. Reeves. R. 355. On the same day, Plaintiff had a physical therapy appointment at which she advised that "[p]ain has increased in my back, legs, and neck since the last fall." R. 429. The therapist noted that Plaintiff "had difficulty with completion of exercise, secondary to pain levels." R. 429. Plaintiff saw the physical therapist again on September 7, 2006 and reported that her pain "continues to get worse" and she would be having another MRI the following Monday. R. 427. The therapist again noted that Plaintiff "had difficulty with completion of exercise, secondary to pain levels." R. 427. The session "[f]ocused on right UE and safety instruction for stairs, curbs, and work ADL." R. 427. On September 11, 2006, Plaintiff had an MRI at Greenville Hospital, which revealed a "suspected focal peri-neural cyst on the left L5-S1[.]" R. 296. Plaintiff saw her physical therapist again on September 12, 14, and 19, 2006. At each session, Plaintiff reported that the pain in her back, neck and shoulders "from recent falls" continued. See R. 421, 423, 425. On September 21, 2006, Plaintiff had another physical therapy appointment. She reported, "[t]hey said I have a cyst on my spine, pinching on the nerve roots . . . ." R. 419. The therapist noted that Plaintiff "had difficulty with completion of exercise, secondary to pain levels. Awaiting consultation with Neurosurgeon for cyst in back." R. 419. On September 26, 2006, Plaintiff had a physical therapy appointment at which she reported that she had injured her left knee in another fall: "My husband's knee landed on my left knee when we fell." R. 417. The physical therapist again noted that Plaintiff "had difficulty with completion of exercise, secondary to pain levels." R. 417. At Plaintiff's September 28, 2006 physical therapy appointment she complained that her knees still hurt and advised that she was waiting to have her left knee looked at and for a follow up with a neurosurgeon. R. 415. The therapist noted that although Plaintiff "had difficulty with completion of exercise, secondary to pain levels," her "UE

improved since last visit with improved flexibility in cervical/shoulder areas s/p manual tx." R. 415.

On September 29, 2006, Plaintiff saw Dr. Hamberis for complaints of "knee discomfort and instability." R. 310. Dr. Hamberis wrote that Plaintiff "states she has had a couple of injuries to it but does not remember anything particularly bad. . . ." R. 310. However, the "[x]-ray reveals no problems," and Dr. Hamberis concluded that the knee pain is "[p]robably tendinopathy." R. 310. Dr. Hamberis prescribed medication to address Plaintiff's knee pain and for allergies and, because he "note[d] that bones appear some what osteoporotic," he "went ahead and got a bone density set up for her for further evaluation." R. 310.

On October 10, 2006[8] Plaintiff had another physical therapy appointment. Per the notes from that session, Plaintiff "states that since starting therapy, pain is less frequent. Unfortunately, this remains an issue[] and at times prevents patient from lifting weighted objects such as groceries and performing resistive work tasks. . . . [s]he has fallen several times as her left knee has begun to hyperextend." R. 459. The therapist also observed that

> [Plaintiff] has made several changes to be able to perform her job such as positioning and AE use. She is very compliant with all HEP's when pain does not limit exercises. [Plaintiff]'s entire right upper extremity is affected by hypersensitivity to heat and cold. Her hand has a mottled appearance and is cold to the touch when compared to [her] right hand. Hand temperature was equal to the right following treatment session. [Plaintiff]'s resting posture is with fingers extended, MP's in hyperextension and small/ring fingers in abduction. [Plaintiff] has positive Tinel's at cubital tunnel. She presents with s/s of ulnar and median nerve neuropathies. Muscle wasting is evident in pollicis and digiti minimi. Biceps and extensor wad was in spasm at start of session. She compensates with digit and wrist flexors for strength while performing her work tasks. She is unable to adduct small and ring fingers which has resulted in MP hyperextension. While trying to perform resistive fine motor tasks, DIP's hyperextend for compensation of weakness.

---

[8]    This record is dated October 10, 2005; however, given the number of visits, cancels and no-shows reflected on the report, it appears that 2005 was a typographical error and the record should have properly been dated in 2006. See R. 459.

R. 459–60.  Plaintiff had another physical therapy appointment on October 12, 2006, at which the

therapist noted that Plaintiff tolerated the session "with decreased symptoms and increased function."

R. 412.  On October 13, 2006, Plaintiff's physical therapist generated a progress report, which

advised that Plaintiff's "[f]unctional status has improved with occupational therapy," "[s]ubjective

and objective findings are improving with occupational therapy," and Plaintiff "is progressing

toward goals outlined in initial evaluation." R. 413.  The therapist noted, however, that Plaintiff still

suffers from "[p]oor prehension" and "[p]oor skeletal alignment through fingers during the fine

motor tasks and resistive tasks." R. 413.  The therapist recommend that Plaintiff continue

occupational therapy two times a week for four weeks "to address deficits and prevent skeletal

malalignment of digits," and that Plaintiff "would benefit from custom wrist support splint . . . to

incorporate correct alignment [of] digits during functional activities." R. 414.  Plaintiff saw her

physical therapist next on October 17, 2006, at which visit Plaintiff reported that buddy taping her

fingers helped them to stay in better alignment. R. 409.

> On October 19, 2006, Plaintiff saw Dr. Hamberis who noted,

> [Plaintiff reported] that she fell and hit her foot and twisted both knees and also right
> hand.  She states that she basically just fell on a carpeted area and her feet got caught.
> Ever since the fall she has been in a lot of discomfort especially in her foot.  She has
> not had an easy time moving.

R. 619.  Dr. Hamberis scheduled an MRI of Plaintiff's right foot for that same night. R. 619.  The

results of the MRI were normal. R. 304.

> On October 24, 2006, Plaintiff saw Dr. Robert Wood, M.D. for an examination at the

Steadman Hawkins Clinic in Simpsonville, South Carolina.  Dr. Wood summarized,

> This patient comes in with a multitude of complaints, mainly related at the present
> time to bilateral knee pain.  She also states that she gets some twitching and pain in

her right upper extremity. Historically, it is quite interesting that she has been seen by several physicians, including neurologists, who thus far have not been able to determine the exact etiology of her symptoms. She states that she has a giving way sensation in her legs, when they seem to go weak and give out on her, and she has fallen on to her knees several times. . . . She states her right knee also hyperextends when she walks. She further states that with regard to her right upper extremity she has difficulty controlling her fifth finger, as it seems to hyperextend and flex sometimes involuntarily and she is unable to control this.

R. 346. Dr. Wood observed that Plaintiff sat "comfortabl[y] on the table," and "seem[ed] to have appropriate affect, although she seems to dwell quite a bit on her somatic symptoms." R. 348. Dr. Wood was unable to offer Plaintiff a diagnosis following his examination. He concluded,

To try to sort this out, I believe an MRI may be helpful, although I am concerned that it may not show significant pathology and further diagnostic testing may be needed by physiatry [sic] or neurologist. We may need to obtain her previous records as well. I am unsure if this is simply a true pathology of symptoms. At the present time, we will see her back once this is obtained to further discuss treatment options.

R. 349.

On October 24, 2006, Plaintiff had a physical therapy appointment. She reported that she was feeling "pressure areas on new splint made at bony prominences right dorsal hand/wrist." R. 407. The therapist advised that the splint would be modified to maximize comfort and outcome and Plaintiff would use buddy wrap to stabilize until the splint modification was complete. R. 408. Plaintiff again saw the physical therapist on October 26, 2006; the notes for this visit were substantially the same as the last. R. 405. At her next physical therapy appointment on October 31, 2006, Plaintiff reported that the splint was "rubbing on the ulna styloid." R. 403. She also complained that "her legs are giving out and she [feels] she has to stay rigid to maintain balance." R. 403. The therapist observed that Plaintiff "had difficulty maintaining her balance while on foam roller and required max cueing [sic] not to fixate to maintain her stability/balance." R. 403. On

20

October 31, 2006, Plaintiff also had bone density testing.  R. 515.  Based on the results of that testing, Plaintiff was encouraged to try some type of calcium replacement medication and increase her physical activity, if possible.  R. 515.

On November 6, 2006, Plaintiff was seen at Southeastern Neurosurgical for a neurosurgical consult at the request of Dr. Hamberis.  R. 336.  Per the records from the visit, Plaintiff's main complaint was of low back pain: "She states that she has fallen about 5 times over the past several months."  R. 336.  Plaintiff estimated her usual pain level at an 8 on a scale of 1 to 10 and reported that her "[f]unctional impairment is severe—when present it interferes with most but not all, daily activities."  R. 336.  None of the testing done at the consultation revealed the cause of the Plaintiff's pain, but follow up lumbar spine films were ordered "to determine that there is no significant compression."  R. 338.

On November 10, 2006 Plaintiff had an MRI of her lower extremities.  R. 341.  There was evidence of "mild patella alta"[9] and "[c]artilage thinning is noted in the lateral patellar femoral compartment."  R. 341.  The "ACL is thinned" and there was a "question of previous interstitial or partial tear."  R. 341.  There was a "small effusion," but the results were "[o]therwise unremarkable."  R. 341.

On November 14, 2006 Plaintiff saw Dr. Wood for the results of her MRI.  In the history section of Dr. Wood's report from that day, he advised that,

> [Plaintiff] has extensively been worked up she states with neurologists and electrical tests and all have been normal but she is convinced there is something going on. Regarding her knees, she gets a giving out sensation and feels there must be significant ligamentous problems in the knees.  Again, the patient continues to have multiple somatic complaints that are vague in nature and difficult to pinpoint.

---

[9]    Patella alta is the term used when the kneecap rides high up on the thigh bone.

21

R. 344. The examination showed that, "on standing . . . she seems to have normal alignment," he observed no swelling of the knee itself and noted that "[t]here appears to be full active and passive range of motion without significant hyperextension on either side and full range of motion of the hips and ankles." R. 344. As for the MRI, Dr. Wood advised that it showed "only some chondromalacia of the lateral facet of the patella but no other significant abnormalities, certainly no significant ligamentous injury, possible old interstitial tear of the ACL, but no meniscal tear." R. 344. He concluded:

> This still remains somewhat of an enigma. I do believe that she likely has some patellofemoral problems secondary to the poor VMO musculature and feel that despite previous efforts, a course of vigorous physical therapy should be attempted before any attempt at surgical intervention is made. . . . the MRIs essentially show only some mild chrondomalacia, not significant pathology to warrant the type of symptoms she seems to state she is getting with a giving-out sensation in the knee. . . . [I] wonder if there is weakness due to disuse . . . .

R. 345.

On that same day, Plaintiff went to physical therapy. The notes from that session provide that "[Plaintiff] states she fell the other day and has a compression fracture in her lumbar area is why she cancelled her appointment. Patient states she saw the physician and stated it was ok for her to continue with treatment. Patient is to see [n]ew Neurologist this [T]hursday morning." R. 401.

Two days later, on November 16, 2006, Plaintiff had a neurological evaluation at Neurology Associates of Greenville with Dr. Benjamin R. Millar, M.D. R. 384. In the report from that evaluation, Dr. Millar describes Plaintiff as "[a] 36 year old with multiple neurologic and musculoskeletal complaints in a fairly thorough but negative workup by three previous neurologists. . . . [S]he also had nerve conductions right upper and right lower which were normal as well." R. 386. He advised that he would "start over at square one by repeating a lumbar puncture and getting

22

right upper and lower extremity nerve conductions again but this time with an EMG." R. 386.

Plaintiff's next physical therapy appointment was later that same day, at which she reported that "her back is very sore [and] she saw the Neurologist today and he is not sure what is going on." R. 399. The therapist noted that, during the session, Plaintiff "had difficulty maintaining her balance on dynamic surface i.e. swiss ball," and Plaintiff "tends to fixate to maintain her stability/balance." R. 400.

On November 21, 2006, Plaintiff saw Dr. Reeves for an examination. R. 354. At this visit, Plaintiff's chief complaints were "problems [with] depth perception," "blurred vision," and "[h]ard to tell distance when driving when getting close to another car." R. 354. Later that day, Plaintiff attended physical therapy. She advised "reported she saw the eye doctor today that told her her eye difficulties and symptoms are neuromuscular." R. 397. The therapist also wrote that,

> [Plaintiff] states that since starting therapy, pain is less frequent. Unfortunately, this remains an issue[] and at times prevents patient from lifting weighted objects such as groceries and performing resistive work tasks. [Plaintiff] states that testing has not resulted in any findings. She has fallen several times as her left knee has begun to hyperextend.

R. 397–98. Again, the therapist noted that Plaintiff "had difficulty maintaining her balance on dynamic surface" and "tends to fixate to maintain her stability/balance." R. 398. At her next physical therapy session, on November 28, 2006, Plaintiff advised that "she feels as though her symptoms are increasing and are not improving." R. 395.

On November 30, 2006, Plaintiff was again seen by Dr. Millar for continued complaints of "weakness in the lower extremities and especially in the right upper extremity and the hand." R. 378. A concentric needle EMG was performed sampling certain muscles. Of this testing, Dr. Millar observed,

23

> The patient had inconsistent poor effort on muscle contractions with the needle in place. Sometimes she'd have better movement of the muscles on my exam before the needle was in and then gave very poor effort once the needle was in place. The decreased interference patterns noted are because of poor contractile effort. The only hint of an abnormality was some increased amplitude of the vastus medialis and some inability to relax the bicep and the flexor digitorum superficialis muscles.

R. 378. Dr. Millar found "[c]linically insignificant abnormalities on antidromic median and ulnar sensory delay. This does not explain the patient's symptomatology. No findings to suggest radiculopathy, myopathy or myotonia." R. 378. He planned to "follow[]up the MRI and have [Plaintiff] come back for the repeat lumbar puncture." R. 378. Later that day, Plaintiff attended physical therapy where she advised that "she had another EMG today and is very sore." R. 393. The therapist noted that Plaintiff, "still tends to fixate to maintain her stability/balance. She is complaining of more symptoms neuromuscular in nature." R. 393.

On December 5, 2006 Plaintiff went to her physical therapy appointment where she reported that "her back is having spasms today and feels like it is going to as patient describes lock-up." R. 391. Plaintiff advised that she had a lumbar puncture scheduled for the next week, as well as a hysterectomy. R. 391. The therapist observed that Plaintiff "has better recruitment of scapular stabilizers during exercises," but that Plaintiff "had low back discomfort throughout treatment session even with multiple repositioning and pain inhibition techniques." R. 392. On the following day, Plaintiff was assessed for and fitted with forearm crutches. The therapist observed that Plaintiff "had mild difficulty coordinating UE/LE advancement of crutches with 2 point gait pattern but otherwise performed well." R. 461.

On December 7, 2006, Plaintiff had a lumbar puncture at Neurology Associates of Greenville. R. 600. On January 4, 2007, Plaintiff had a neurological follow-up at the same provider.

R. 598.  The report from that follow-up conducted by Family Nurse Practitioner Amanda A.

Geddings summarized Plaintiff's history as follows:

> [Plaintiff] is  a 36 year old female who has had progressive difficulty with
> [complaints of weakness, balance difficulty, blurred vision, dizziness, and falls] for
> four years.  She's been evaluated by at least three neurologists.  She has had an
> unremarkable brain MRI x 2 with the most recent being in March of 2006.  She's had
> unremarkable spinal cord imaging, negative blood testing for acerylcholine receptor
> antibody, B12, Folate, TSH, hemoglobin AIC.  She has undergone two spinal taps
> both of which have shown normal spinal fluid with no evidence of multiple sclerosis.

R. 598.  Both Ms. Geddings and Dr. Millar reviewed Plaintiff's case and planned to repeat her brain

MRI, because it had been one year since Plaintiff's last imaging.  R. 599.  They also planned to refer

Plaintiff to Duke University for evaluation by a neuromuscular specialist.  R. 599.  The report

concluded,

> No additional medications or recommendations are made at this point.  Understand
> she is currently participating in physical therapy which I have encouraged her to
> continue with.  We did recommend that she obtain lower extremity braces and
> although those were denied by her insurance we have sent an appeal letter.

R. 599.  On January 8, 2007 Plaintiff had a brain MRI at Healthsouth in Greenville.  The conclusion

was "[n]o intracranial abnormality is identified . . . a small amount of fluid is apparent in the left

mastoid air cells.  This is nonspecific and may be serious or inflammatory."  On February 8, 2007

Plaintiff was seen by Dr. Hamberis, who suggested a referral to an orthopedist for Plaintiff's long-

standing problems with her knees.  R. 619.

On March 15, 2007, Plaintiff had a psychiatric evaluation with Dr. Rhett Myers, M.D. at

Upstate Psychiatry.  R. 659.  Dr. Myers described Plaintiff as "a neatly dressed female whose affect

is fairly normal.  Her mood is negative.  She has no suicidal or homicidal thoughts.  Her thoughts

reach a logical conclusion.  She has no hallucinations or delusions.  Her memory and concentration

are fair.  She is of average intelligence.  Her insight is adequate."  R. 659.  Plaintiff described

"feelings of sadness and depression, as well as fatigue and sleep difficulties," but denied "any

significant anxiety or social withdrawal."  R. 659.  Plaintiff advised that "she worked full time for

sixteen years, but had to quit in November because of poor concentration and weakness."  Id.  Dr.

Myers diagnosed Plaintiff with Depressive Disorder, Not Otherwise Specified.  R. 659.[10]  In terms

of treatment, Dr. Myers concluded that Plaintiff, who was already taking Lexapro and Klonopin,

should continue with those medications.  He also prescribed Cymbalta to be taken daily "to see if

it will help with her depressive symptoms," and Provigil every morning for fatigue.  R. 660.[11]

On March 29, 2007 Plaintiff had a neurological follow-up with Dr. Millar, who summarized

Plaintiff's case as follows:

> This is a 37 year old white female with multiple symptomatic complaints as detailed
> in our previous notes who went to Duke University for a neurological opinion in
> February at my request.  Dr. Morgenlander of Duke University . . . did a thorough
> consultation reviewing all of our records, labs and radiology reports as well as an
> examination.  He provided over 20 minutes of counseling to the patient and found

---

[10]    On June 28, 2007 Dr. Myers responded to a request by the Social Security
Administration for more information "[t]o better determine if a mental condition
significantly limits this patient's ability to work[.]"  R. 653.  In his responses, Dr. Myers
advises that Plaintiff was prescribed medication which has helped her condition and that
psychiatric care was recommended.  R. 653.  Dr. Myers further advised that Plaintiff's
thought process is intact, her thought content is appropriate, her attention and
concentration is adequate and her memory is adequate.  When asked to describe her
mood/affect, Dr. Myers indicated that she was "worried/anxious," but not "flat,"
"depressed," "angry," or "withdrawn."  Dr. Myers further advised that Plaintiff is
properly oriented as to the time, place, her situation and her person.  R. 653.  In
response to the question "[d]oes this patient exhibit any work-related limitation in
function due to a mental condition?" Dr. Myers circled "moderate."  Dr. Myers further
advised that Plaintiff is capable of managing her funds.  R. 653.

[11]    Cymbalta is used to treat several conditions, including major depressive disorder,
general anxiety disorder, neuropathic pain and fibromyalgia.  Provigil is used to
promote wakefulness in individuals suffering from various sleep disorders.

26

that she did not have a neurological disease but felt that it was functional and possibly psychosomatic. He recommended seeing a psychiatrist or a psychologist. Since then she has seen a psychiatrist locally who added Cymbalta . . . to her Lexapro and gave her a trial of Provigil to try and keep her more alert. She's not had any psychological counseling however. She also went back to see Dr. Josette Johnson of rheumatology who repeated a bunch of tests which are still pending.

R. 741. Dr. Millar noted that Plaintiff "does feel a bit depressed, was quite upset with Dr. Morgenlander's assessment at Duke University." R. 741. He concluded that,

Based on our extensive negative workup and Dr. Morgenlander's opinion that this is functional or psychosomatic I think she needs to be referred to a clinical psychologist. I'm not going to do any further testing. She asked about muscle biopsy but I don't think that is indicated especially because Dr. Morganlander felt there was no likelihood of this being truly neurological.

R. 742.

On May 21, 2007, Plaintiff saw Dr. Hamberis for a migraine headache. R. 728. Dr. Hamberis gave Plaintiff Demerol and Phenergan which seemed to help. He noted that "[Plaintiff] will try to go home and sleep it off . . . . I will talk to the neurologist about followup. He seems to think that most of her issues are psychological and she will be seeing a psychologist as well as a psychiatrist." R. 728. On June 28, 2007, Plaintiff saw Dr. Hamberis for pain in her lower legs and throbbing in her right arm following a fall she took getting into an amusement park ride on vacation. R. 727. Dr. Hamberis prescribed Toradol and referred Plaintiff to Dr. Waters at the Pain Management Center. R. 727. On July 2, 2007 Plaintiff was seen at Riverside Family Practice by a doctor other than Dr. Hamberis, who was not present that day. Per the notes from that visit,

[Plaintiff] today . . . returns with multiple complaints. She tells me that she has a numbness in both of her arms, the entire arm and hand bilaterally. She also has numbness in her lower extremities and feet bilaterally. . . . She tells me that her back feels stiff. She tells me that her legs feel dead. She has difficulty with her fine motor skills and coordination and [is] finding it difficult to help her son cut his food and to use scissors. She has nausea, hoarse sounding voice and insomnia. She is on a

27

> variety of medication for chronic pain including Lyrica . . . , Synthroid, Klonopin, Topamax, Cymbalta . . . , Focalin and Allegra.

R. 726.[12]  The examination did not yield anything abnormal, except "[w]hen I attempted to evaluate the strength of her upper extremities she seemed to have very little strength and erratic muscular movements, however she seemed to use her upper extremities normally throughout the course of the exam." R. 726.  Physical therapy was recommended, but Plaintiff "tells me that she had received about a year of physical therapy . . . and did not have any improvements during that time." R. 726.  Ultimately, the healthcare provider recommended that Plaintiff follow up with Dr. Hamberis in one to two weeks.  R. 726.

On July 6, 2007 Plaintiff returned to the Riverside Family Practice where she saw Dr. Hamberis with complaints of migraine headaches and no relief with any of the medications that she was then taking.  Dr. Hamberis noted that Plaintiff was "on Lyrica, Synthroid, Klonopin and possibly Provigil but she does not remember to take it all the time" R. 727.  Plaintiff reported that

> She is nauseated, photophobic and in a lot of distress.  She is given . . . Demerol and . . . Phenergan and got a tremendous amount of relief at least it did relax her to the point where I could talk to her and we talked about trial of Topamax which I think would probably be okay for her to try.

R. 727.  Dr. Hamberis also observed that "[Plaintiff] is walking with a cane.  Etiology . . . remains an enigma for me as well as the neurologist who thinks that it is psychiatric." R. 727.

On July 9, 2007, Plaintiff saw Dr. Hamberis again "for recheck of back." R. 726.  According to Dr. Hamberis' notes, Plaintiff was "doing somewhat better.  She is more mobile." R. 726.

---

[12]    Lyrica is an anticonvulsant generally used to treat seizures, nerve pain and fibromyalgia. Topamax is an anticonvulsant used to prevent seizures and migraine headaches. Focalin is used to treat attention deficit hyperactivity disorder. Allegra is a prescription-strength allergy drug.

However, he also reported that "[s]he has been feeling somewhat weak but states that the numbness and pain continues to persist[.]" R. 726. Plaintiff had been given another MRI on July 3, 2007 and Dr. Humberis noted that this MRI "showed a paracentral protrusion with some degree of neural impingement." R. 726. Dr. Hamberis gave Plaintiff a copy of the MRI to take to a Dr. Satterfield "for a possible injection." R. 726. Dr. Hamberis further noted that Plaintiff saw a nutritionist recently "who told her she was probably hypokalemic and hyponatremic from hair sampling. I went ahead and checked electrolytes today too for verification . . . ." R. 726.

On July 20, 2007, Plaintiff returned to see Dr. Hamberis, this time complaining of "numbness throughout body and weakness." R. 725. Plaintiff also "describes discomfort in the right shoulder area and may have what appears to be [a] healing clavicular fracture." R. 725. Dr. Hamberis conducted an examination, concluding that Plaintiff "does not have any cranial nerve abnormality and does not have other issues or changes as far as I can tell with exam except that she feels that she is off balance." R. 725. Plaintiff reported that she "needs at times assistance to walk because she feels weak." R. 725. Dr. Hamberis further noted that all of the neurologists that Plaintiff has seen "seem to think that this is all psychosomatic." R. 725. He continued,

> My frustration with this is that the patient is not doing any better and in fact is worse. She is tearful today. Her husband and child are in tow with her and they seem to vouch that she does try to do as much as she can but then has bad days where she cannot get out of the bed.

R. 725. Dr. Hamberis increased Plaintiff's dosage of Cymbalta and recommended "try[ing] Mayo Clinic for possible new evaluation and help for [Plaintiff]." R. 725. On August 17 and 21, 2007, Plaintiff was again seen by Dr. Hamberis; on these visits Plaintiff complained that she was having trouble breathing. R. 724. On the first visit, Dr. Hamberis opined that Plaintiff was suffering from

asthma or reactive airway disease and provided her with an inhaler. R. 724. On the second visit, Dr. Hamberis wrote, "I think basically anxiety driven. There is a lot of psychological stuff going on here." R. 724.

In August 2007 Plaintiff also underwent extensive testing and evaluation at the Mayo Clinic in Jacksonville, Florida, which focused on her complaints of dizziness, neurologic symptoms, chronic pain syndrome, knee pain, vocal cord dysfunction, health maintenance, and hypothydroidism. R. 667–68. Dr. Gary A. Glicksteen, M.D. summarized several of the findings made by specialists that examined Plaintiff in connection with her Mayo Clinic evaluation. In response to Plaintiff's complaints of dizziness, Plaintiff was tested for inner ear problems and balance disorders by Dr. Larry B. Lundy, M.D.; all of this testing was within normal limits. R. 667. In response to Plaintiff's complaints of "numbness and paresthesias, progressive weakness," Plaintiff was seen by Dr. Kevin B. Boylan, M.D. in the Department of Neurology. R. 667. The "EMG study showed some subtle findings initially, but a repeat study showed them to be normal." Id. After "Dr. Boylan was unable to detect [any] specific neuromuscular disorder," he referred Plaintiff to Dr. Jay A. Van Gerpen, M.D. for a movement disorder consultation. R. 667. Dr. Glicksteen summarized: "Dr. Van Gerpen did not find any clear evidence of movement disorder with the variety and inconsistency of findings. He felt she may well have some psychogenic component to her symptoms. I suggested to her and her husband that a psychological evaluation would possibly prove helpful to see if there is some psychosomatic component to her problems." R. 667. Dr. Andy Abril, M.D. evaluated Plaintiff for chronic pain and fibromyalgia. R. 672. Dr. Abril extensively reviewed Plaintiff's previous evaluations, noting that "no evidence of any neuromuscular or movement disorder has been found," "EMGs have been basically unremarkable," and an outside rheumatologist

that saw Plaintiff found no evidence of autoimmune rheumatological process. R. 672. Consistent with previous testing, Plaintiff's "rhematological workup here has been basically unremarkable[.]" R. 672. In sum, Dr. Abril advised Plaintiff that he agrees with a previous diagnosis of chronic pain syndrome and fibromyalgia; however, because Plaintiff was already taking Cymbalta and Lyrica, Dr. Abril advised that he could not "think of anything helpful from a pharmacological standpoint." R. 673. He suggested that "[Plaintiff] would benefit the most from an intense program of pain rehabilitation, such as the one offered at the Mayo Clinic in Rochester." R. 673.[13] He "reassured [Plaintiff] that I do not see evidence of any systematic autoimmune process going on," and spoke to her about fibromyalgia, explaining that it is "often . . . associated with neurological like-symptoms, but there is no underlying neurological disorder in a large majority of cases." R. 673. Plaintiff was also seen by Dr. Shane A. Shapiro, M.D. for an orthopedic consult for her knee pain. Dr. Shapiro found that Plaintiff "has 5/5 strength throughout," but noted "[h]owever, this is effort dependent." R. 670. Dr. Shapiro "felt that [Plaintiff] had patellar femoral pain syndrome in addition to fibromyalgia. She also has some thinning of the ACL on the left knee that is probably not the major pain generator. He suggested Physical Therapy and exercises, consideration toward injection therapy could also be made." R. 667–68. Because of Plaintiff's complaints of vocal cord dysfunction, she was evaluated for possible asthma. Pulmonary function testing was normal. R. 668. Plaintiff was also given a bronchoscopy "that showed only a paradoxical vocal cord dysfunction with the cords

---

[13]    Dr. Christopher D. Sletten, Ph.D., who also saw Plaintiff at the Mayo Clinic, similarly recommended that Plaintiff consider taking part in a "pain rehabilitation course." R. 679. Dr. Sletten reported that Plaintiff "endorses a pattern of overactivity followed by prolonged recovery." R. 678. He explained that a pain rehabilitation course "would be 3 weeks of daily treatment with physical and occupational therapy for physical reconditioning and improved activity tolerance. In addition, they would address some of the functional behavior morbidities [Plaintiff] is currently experiencing." R. 679.

adducting on inspiration." R. 668.  The specialist that administered the bronchoscopy recommended that Plaintiff have speech therapy for vocal cord retraining.  R. 668.  The rest of Plaintiff's labs, Dr. Glicksteen wrote, "are essentially normal."  R. 668.

On September 6, 2007, Plaintiff had an appointment with Dr. Hamberis.  R. 724.  Dr. Hamberis noted that Plaintiff reported that she was told at the Mayo Clinic that she has "severe fibromyalgia" and "because of vocal cord dysfunction . . . she would have to see a speech therapist." R. 724.  Plaintiff also advised Dr. Hamberis that she "was given some recommendations at the Mayo Clinic to go to a two month rehabilitation clinic in Minnesota [but] she states that she cannot logistically do this."  R. 724.  Dr. Hamberis concluded that Plaintiff "continues to have pain and we will continue the present medicines because I do not know what else to do for her pain and again she has had a complete evaluation at the Mayo Clinic which I think solidifies her diagnosis."  R. 724.

On October 4, 2007 Plaintiff was seen at the Evelyn Trammell Voice & Swallowing Center at St. Joseph's Hospital in Atlanta, Georgia for an initial voice evaluation to address her complaints of chronic shortness of breath.  R. 746.  The evaluation notes that Plaintiff has "a diagnosis of paradoxical vocal fold motion disorder . . . from the Mayo Clinic."  R. 746.  During the evaluation, "trial therapy was completed for respiratory retraining exercises typically used" to treat Plaintiff's diagnosis.  R. 746.

On October 10, 2007, Plaintiff was seen by Dr. Hamberis after she "woke up feeling that she had a snake in the bed and fell out of the bed and then struck the left side of her body hitting her head first and then caused tremendous discomfort in the cervical as well as trapezius area on the left side," since which, Plaintiff had been experiencing lower back pain. R. 723.  Plaintiff already had an MRI scheduled for the right shoulder, "but does not feel that the right shoulder is the issue at this point

though she would like to get in because she feels that it is getting much more immobile than usual."

R. 723.  Dr. Hamberis conducted an examination and noted that Plaintiff "is tender everywhere but

usually is."  R. 723.  He further noted that, "[a]t this point she has chronic pain medication and I did

not renew or give any pain medication."  R. 723.  Finally, Dr. Hamberis observed that, as for

Plaintiff's "[s]peech disturbance," "[s]he is currently going to speech therapy and this is improving."

R. 723.

The next day, Plaintiff had a brain MRI at Diagnostic Health in Greenville at Dr. Hamberis'

request.  The results were normal.  R. 730.  A few days later, on October 15, 2007, Plaintiff had an

MRI of her right shoulder at Greenville Hospital.  R. 731.  The MRI revealed a "[p]osterior-superior

labral tear extends from 10:30 to 12 o'clock with associated paralabral cyst which extends into the

spinoglenoid notch without evidence for neural impingement."  R. 731–32.  Otherwise, "[l]abral

capsular structures otherwise unremarkable. . . . [r]otator cuff intact."  R. 731–32.

On October 17, 2007 Plaintiff returned to see Dr. Hamberis "for recheck after fall."  R. 722.

Dr. Hamberis noted that,

> [Plaintiff's] MRI ended up being clear.  She had a lot of back spasm and pain.  She
> states that she has tried pain medication that has been minimally helpful. . . .  An x-
> ray today reveals no gross abnormalities especially in the spine.  She has definite
> discomfort but this is so vague and all over the place that I think more consistent with
> fibromyalgia.  Thought I am concerned about the spasm because this appears to grab
> her out of nowhere and she states that it is pretty severe for 2–3 minutes.

R. 722.  Dr. Hamberis also noted that Plaintiff was "[s]till having voice issues and going to speech

therapy and will have speech therapist send me a need for an order for a swallowing study."  R. 722.

On October 29, 2007, Plaintiff was seen by Dr. W. Arnold Batson M.D. for right shoulder

pain at the request of Dr. Hamberis.  R. 793.  Dr. Batson noted that Plaintiff's "[g]ait and posture are

normal." R. 793.  After examining Plaintiff, Dr. Batson summarized,

> The possibility of doing an anthroscopic exam of the shoulder with labral repair and excision of the cyst was discussed.  The patient would like to avoid surgery.  She would like to try therapy which may be of help.  I believe most of her pain is really coming from her fibromyalgia rather than true shoulder injury though she may be having some pain from the paralabral cyst and labral tear.  I cannot tell if this was related to her actual injury but it very well could be.  She was referred for physical therapy.

R. 793.

On November 6, 2007 Plaintiff was again seen at the Evelyn Trammell Voice & Swallowing Center at Dr. Hamberis' request, this time for videostroboscopy and a modified barium swallow study. R. 746.  Plaintiff reported that home practice of the trial therapy exercises taught to her at her previous visit had been successful in remediating her shortness of breath symptoms.  Although Plaintiff continues to have episodes, "she feels she is able to manage them with the breathing exercises."  R. 746.  However, the report went on to state that,

> Since the previous evaluation, the patient reported [that] . . . [h]er voice has significantly worsened.  This problem appears to come and go intermittently with no known cause.  The patient telephoned this clinician during one such episode of worsened voice; the presentation was consistent with a severe to profound muscle tension dysphonia and characterized by extremely high pitch and breathiness.

R. 746.  The report also noted that Plaintiff

> reports an episode where she fell out of bed and hit her spine and shoulder.  Since the fall, she reports she has been having back spasms.  She feels the spasms have subsequently moved into her throat, her hands, and her feet.  She states her hands sometimes spasm into a gripped posture, and she cannot move her fingers.  She has an orthopedic appointment scheduled to assess any orthopedic needs; in the mean time, she is taking muscle relaxers[.]

R. 746.  The report summarized Plaintiff's swallowing complaints as follows:

> "I have trouble swallowing all meats, all breads, just about all starchy foods.  It is hard to throw the food back with the tongue, and I have to gulp several times to get

34

the food down.  If I don't have a drink, I feel like I will choke on the food because it is still in the throat.  On just a few occasions, I have had water go up the nose and out onto the floor."

R. 746.  The report noted that, "[a]fter further questioning, the patient indicated that the nasal regurgitation she described had occurred on only 2 occasions over 5 years. . . . [she] reported her swallowing problems have been ongoing for 5 years or more."  R. 747.   In addition, Plaintiff reported "an[] unintentional weight loss of 20 pounds over the past 6 months, which she attributed to her swallowing difficulties."   R. 747.   Plaintiff was noted to be taking the following ten medications: Klonopin, Lyrica, Synthroid, Cymbalta, Topamax, Adderall, Talwin, Soma, Diazepam, and Prevacid.  R. 746–47.[14]  The examination revealed "some oropharngeal deficits" but "[t]he deficits . . . did not appear to significantly impact function and did not explain the severity of impairment the patient perceives."  R. 748.  The Center recommended that Plaintiff choose soft, moist foods, alternate solids and liquids to promote clearance, take part in an esophagram/barium swallow study to further evaluate esophageal function, and "[c]onsider repeat neurology consultation, given changes in the patient's symptoms."  R. 748.  The Center also conducted a videostroboscopic examination of Plaintiff's laryngeal function, which revealed no overt changes in Plaintiff's vocal fold physiology.  R. 752.  Finally, trial therapy was also conducted, which appeared to significantly improve Plaintiff's voice almost immediately.  R. 752.

On November 9, 2007 Plaintiff began another round of physical therapy, this time seeing physical therapist Donna McGarity at Piedmont Orthopaedic Associates in Greenville for shoulder

---

[14]     Adderall is used to treat attention deficit hyperactivity disorder.  Talwin is a pain medication that is composed of two different medications, one of which is an opiate-type pain reliever.  Soma is a muscle relaxant.  Diazepam is used to treat muscle spasms, seizures and anxiety.

pain.  R. 790.  In documenting the history of Plaintiff's shoulder pain, the physical therapist noted

that

> [Plaintiff] is very frustrated w/her care as the only answer seems to be that all of the
> above is from a psychosomatic origin.  I do not feel this is the case as she has many
> physical abnormalities despite passing all neurological tests.  She is on disability
> from the above but used to be a graphic designer.  She does not seem to be depressed
> other than about the lack of answers for her condition.

R. 790.  The therapist further observed that Plaintiff's "[g]ait is painful and awkward in nature."  R.

790.  She noted that Plaintiff advised that "she does not tolerate heat or 'a day full of activities w/her

children' as this will fatigue her for 48 hours."  R. 790.  The therapist recommended that Plaintiff

participate in physical therapy two times a week for the following eight weeks.  R. 791.

Plaintiff's next physical therapy appointment was on November 14, 2007.  R. 789.  The

physical therapist noted that she started slow with Plaintiff, doing 30 minutes of exercise and "5

PROM."  R. 789.  On the following day, November 15, 2007, Plaintiff was seen by Dr. L. Breeden

Hollis Jr., M.D. for lumbar spine pain in consultation at the request of Dr. Hamberis.  R. 787.  After

examining Plaintiff, Dr. Hollis concluded

> Possible facet arthopathy, post-traumatic.  She has other underlying myofascial pain
> syndrome that feeds into this.  Pain medication is probably not going to do much
> good for this since it is extremely localized to one area.  I would advocate an MRI of
> the lumbar spine and then probably follow up with facet injections unless something
> shows up on the MRI that suggested otherwise.

R. 788.  On November 19, 2007 Plaintiff had an MRI of her lumber spine at Greenville Radiology.

R. 784.  Plaintiff saw Dr. Hamberis on the following day, November 20, 2007.  R. 722.  Dr.

Hamberis noted that Plaintiff "is concerned . . . because of her muscle issues and now going to

speech therapy.  She has been going to fibro clinic . . . ."  R. 722.  Because of Plaintiff's "chronic

pain from fibromyalgia," Dr. Hamberis gave Plaintiff a "prescription for Mepergan Fortis to have

on hand if she has severe pain at night." R. 722.[15]   He noted that Plaintiff's "fibromyalgia will be treated through the physical therapy at St. Francis[.]" R. 722.

On November 21, 2007, Dr. Hollis called Plaintiff to relay the MRI results. Dr. Hollis advised that the MRI revealed "a protruding disc at L2-3 level without neural impingement. She was incidentally noted to have a left adnexal cystic mass." R. 783. Dr. Hollis advised that he planned to obtain a pelvic ultrasound and would determine the next step based on that examination. R. 783. With regards to Plaintiff's lumbar spine issues, Dr. Hollis opined that Plaintiff "would benefit from facet injections[.]" R. 783. Plaintiff had her first facet injection from Dr. Hollis shortly thereafter, on November 26, 2007. R. 782. On the following day, Plaintiff had a pelvic transabdominal ultrasound at Greenville Radiology, which revealed a cyst in Plaintiff's left ovary. R. 795. On the next day, November 28, 2007, Plaintiff saw Donna McGarity for another physical therapy appointment. R. 781. At this visit, Plaintiff complained that her shoulder was not feeling better and that she was having intense pain. R. 781.

On December 7, 2007 Plaintiff was discharged from physical therapy by Donna McGarity. The reason for discharge was that Plaintiff had received an order to attend a fibromyalgia program and her insurance would not permit her to both attend that program and continue with physical therapy. R. 780. Ms. McGarity noted that Plaintiff "will be able to incorporate her therapy for her shoulder w/this program." R. 780. On December 19, 2007 Plaintiff saw Dr. Hamberis, at which visit she reported that "she will be seeing the neurologist because speech therapy has only helped so

---

[15]    Mepergan Fortis is a combination of Meperidine, a narcotic pain reliever, and Promethazine, an anti-nausea medication, which is used to treat moderate to severe pain.

much." R. 721. Dr. Hamberis further noted that Plaintiff "still has knee pain but has not offered any sort of help from the orthopedic surgeon stating that he did not think he could help her. He seems to think that this is fibromyalgia." R. 721.

On January 7, 2008 Plaintiff was referred for a neurologic examination to Bernstein & McCasland, M.D. P.C. where she was seen by Dr. Barry J. McCasland, M.D. R. 757. Dr. McCasland described Plaintiff as "a well-developed, pleasant but somewhat odd female in no distress." R. 757. After conducting a neurologic examination, Dr. McCasland concluded,

> This is an unfortunate 37-year-old female with far more complaints than actual findings. The differential diagnosis includes side effects to medications, some type of non-necrotizing muscle disorder, and somatoform disorder. The role of a focal abnormality is unclear, as it should not be expected as a medication side effect or consequence of muscle disease, and could probably not reasonable considered factitious were deliberate.

R. 757.[16] Dr. McCasland recommended that Plaintiff discontinue taking Adderall as "it would be expected to worsen her symptoms, not improve them," "[c]ut Cymbalta . . . to see if it is having deleterious effects," and "[c]ut Lyrica . . . to see if it is having deleterious effects." R. 757. If Plaintiff is no better after that, Dr. McCasland recommend that a muscle biopsy be considered. R. 757. On January 9, 2008 Plaintiff received another facet joint injection from Dr. Hollis for her back pain. R. 779.

On February 11, 2008 Plaintiff had a muscle biopsy at the Emory Healthcare Department of

---

[16]    Somatoform disorder is the name given to a category of psychiatric conditions, all characterized by physical symptoms that suggest a medical disorder, but which cannot be fully explained by another diagnosis. Included in this category of disorders are hypochondriasis disorder, body dysmorphic disorder, pain disorder, which is characterized in part by complaints of pain that causes significant stress or dysfunction but which cannot be explained by medical professionals, and somatization disorder, which generally involves a lengthy medical history reflecting physical complaints that cannot be adequately explained by another diagnosis.

Neurology's Neuromuscular Laboratory. R. 744. The examination revealed only "mild non-specific changes in the skeletal muscle." R. 744. A note attached to the results said, "Tell pt the muscle biopsy was read as mild non-specific changes—so no identifiable disease process. If she whines, RW to discuss it further (I'm not answering questions over the phone)." R. 745.

On February 19, 2008, Plaintiff had an MRI of her left ankle at Diagnostic Health in Greenville at the request of Dr. Hamberis. R. 733. On March 3, 2008 Plaintiff followed up with Dr. Michael E. Tollison M.D., who diagnosed Plaintiff with a left peroneal tendon tear, left ankle instability, and "other joint derangement not elsewhere classified involving ankle and foot." R. 778. Dr. Tollison recommended surgery for left ankle ligament reconstruction and left peroneal tendon repair/reconstruction. R. 778. The surgery was conducted on March 26, 2008. R. 797.

On March 10, 2008, Plaintiff was discharged from physical therapy at St. Francis Outpatient Rehabilitation Services. R. 801. The discharge summary noted that Plaintiff "was seen in physical therapy from 11/29/08 to 02/21/08 with 16 appointments attended, 10 cancellations, and one no-show." R. 801.

> Treatment has included therapeutic exercise, stretching, education, manual therapy, aquatic therapy, and moist heat as needed. The patient was inconsistent near the end of her therapy regarding attendance. The patient was independent with home exercise program. The patient has muscle biopsy on right upper thigh and magnetic resonance imaging on left ankle. The patient is discharged at this time.

R. 801.

On July 30, 2008, Plaintiff had an abdominal ultrasound at Greenville Hospital at Dr. Hamberis' request. The results were normal. R. 736.

On November 25, 2008, Plaintiff had an appointment with Dr. Hamberis. Dr. Hamberis' record from the visit indicate that Plaintiff had lost a great deal of weight, which seems to have been

the result of Plaintiff's taking Topamax for her migraines. R. 718. Plaintiff had discontinued using Topamax and since then she had gained some weight and was doing much better. R. 718. Dr. Hamberis noted that Plainitff was in the office complaining of jaw pain and headaches. R. 718. Dr. Hamberis told Plaintiff to return to the dentist and prescribed a different migraine medication, Treximet, to try for the headaches. R. 718.

On February 25, 2009 Dr. Hamberis filled out a treating physician survey regarding Plaintiff's application for disability benefits. Dr. Hamberis indicated that he believed that Plaintiff suffers from a medical condition or combination thereof that would most probably cause her to experience chronic pain; that the pain is present to such a degree that it would distract Plaintiff in job settings, and elsewhere, and impair her ability to perform daily activities and/or work; and that the pain is likely to increase with physical activity. R. 798–99. Dr. Hamberis advised that he does not believe that Plaintiff is capable of full-time work, even at a sedentary level and that Plaintiff's condition is, most probably, permanent. R. 799. When asked to summarize "all findings, results of lab tests, x-rays, etc., and diagnoses that support the above restrictions and limitations," Dr. Hamberis wrote, "Fibromyalgia (widespread pain, muscular stiffness and difficulty getting restful sleep), x-ray findings (attached), physical therapy (attached)." R. 800.

**B.    Hearing Testimony**

At the hearing held before the ALJ on March 6, 2009, Plaintiff was represented by Tom Ervin. Plaintiff testified that she became unable to work on or about November 8, 2006. When the ALJ asked Plaintiff to explain what happened, Plaintiff stated that,

> I got to where I couldn't hold things in my hand. My hands would claw up. I would have spasms in my body. I had problems with my voice, a vocal cord dysfunction where my voice comes and goes and sometimes I can't talk at all. I have tremendous

40

pain in my body and I couldn't hold onto things.

ALJ Hr'g Tr. 6, R. 27.  Plaintiff further testified that initially in her job, she had to do a lot of standing, but then her employer "put me on the computer where I could sit and then I started having blurry vision, where I couldn't see the screen and then I started having vocal cord problems so I had trouble answering the phone." Id. at 8, R. 29.  Plaintiff also testified that she chokes on food when she tries to swallow.  Id. at 16, R. 37.

When the ALJ asked Plaintiff what her "worst problem" is, in other words, "Why are you here today?"  Plaintiff responded, "My worst problem is pain and muscle spasms and balance and gait problems.  I fall and walk into things a lot." Id. at 9, R. 30.  She testified that she had fallen twice in the past two weeks and "I walk into walls every day." Id. at 10, R. 31.  She also testified that she tore her rotator cuff and had surgery, but it did not mend properly and, as a result, she has trouble lifting her right arm over her head. Id.  She has an ACL tear in her left knee, a ruptured disk in her back and degenerative disk disorder in her lower back, with pain running down both sides of her hips and legs. Id.; see also id. at 11, R. 32. She testified that she is a surgery candidate, "but the surgeon don't want to touch me right now because of my muscle problems." Id. at 10, R. 31; see also id. at 16, R. 37.  She testified that she has a "patellar situation with my kneecap where it goes out of socket and across the bone when she walks," and for that she wears a brace on her right knee. Id.  She testified that she has lost 30 to 40 pounds since she stopped working, but her doctor does not know why. Id. at 11, R. 32.  She testified that she can stand for "[p]robably 10 or 15 minutes" before she "start[s] to sway." Id.  She does not know what causes her balance problems, just that she is "classified with a gait problem." Id. at 12, R. 33.  She testified that she gets dizzy when she moves from a sitting to a standing position and that she is unable to get back up from a kneeling position

without someone there to help her get back up.  Id.  Plaintiff advised that she is able to sit for 30 to

45 minutes at a time, but with back pain.  Id.  When asked about her ability to lift things, Plaintiff

explained that her fingers "claw, go into like a claw position, like arthritic.  I can't straighten my

fingers out."  Id.  When Plaintiff's attorney asked why that is, Plaintiff responded, "I have a tremor

in my hands . . . they don't know why."  Id.  She testified that she "can't grab onto things . . . can't

open jars.  I have trouble lifting things without it falling out of my hands[.]"  Id. at 12–13, R. 33–34.

However, when asked if she thought she could lift 15 pounds, Plaintiff said that she could.  Id.  In

addition, when asked by her attorney if she had been treated by her family doctor for depression and

anxiety, Plaintiff responded yes, and that the depression and anxiety is disabling.  Id. at 24, R. 45.

When asked in what way her depression and anxiety is disabling, Plaintiff responded, "It's just—it's

hard to focus and I still have problems."  Id.

          Plaintiff testified that she wakes up every morning around 6:45 a.m., puts her clothes on and

then gets her nine-year-old son ready for school and takes him to school, which begins at 7:45 a.m.

Id. at 18, R. 39.  Plaintiff goes back to pick her son up from school at 2:30 p.m.  Id. at 19, R. 39.

Plaintiff testified that she does some of the shopping for her family.  Id. at 13, R. 34.  She sometimes

uses the electric scooter at the store, but never uses a scooter at home.  Id.; see also id. at 22, R. 43.

Plaintiff testified that, when she grocery shops, she usually has the bagger put the groceries in the

car for her.  Id. at 13, R. 34.  When she gets home, she usually carries the groceries from the car to

the house, but she explained that "I don't get a whole lot of stuff because I can't make it from one

end of the grocery store to the other without assistance."  Id.  Plaintiff testified that she washes her

clothing, but that it is hard for her "to . . . maneuver the clothes in and out [of the machine],

especially when they're wet.  I get out of breath and it affects my vocal cords and my breathing."

Id.  Plaintiff testified that she uses the shower in her house with a rail; she does not take baths.  Id. at 14, R. 35.  She testified that her husband and her mother clean the house and she cooks "some," but her husband cooks "a lot."  Id.  She goes to a church close to home.  Id.  Sometimes, she attends her son's basketball games.  Id. at 19, R. 40.  Plaintiff testified that she used to enjoy drawing and creating art, "[b]ut I can't hold the utensils in my hands anymore."  Id. at 15, R. 36.  When the ALJ asked whether Plaintiff has to take "rest breaks during the day," Plaintiff responded that she sits down very frequently during the day and that she usually lays down "because of medications."  Id. at 15–16, R. 36–37.  Plaintiff testified that she watches three to four hours a television each day.  Id. at 20, R. 41.  She talks to her friends and her mother a lot on the telephone.  Id. at 21, R. 42.  She uses the computer sometimes.  Id.  In the evening, Plaintiff and her husband help their son with his homework.  Id. at 20, R. 41.  Plaintiff further testified that she has difficulty getting a restful night's sleep; even with the aid of sleeping medications, she usually gets only three to four hours a night of sleep.  Id. at 15–16, R. 36–37.  She tries to go to bed around 10:00 or 11:00 p.m., but testified that she usually does not get to sleep until about probably 2:00 or 2:30 a.m.  Id. at 19, R. 40.  Plaintiff testified that, the year before, she took a vacation to Myrtle Beach with her family; it took them about four hours to get there.  Id. at 21, R. 42.  While they were at Myrtle Beach, Plaintiff sat out by the pool.  Id.

When the ALJ asked Plaintiff if she thought that she could do a sit down job as a receptionist or just answer the telephone, Plaintiff said that she could not, because of her voice: "I—sometimes I go to speak and I don't have a voice and my vocal cords close with aspiration."  Id. at 15, R. 36.  Plaintiff advised that Dr. Hamberis has prescribed her Klonopin and Trazodone, which help relieve her pain, muscle spasms, and twitching, and Lyrica, which relieves her fibromyalgia.  Id. at 17, R.

43

38.  On a scale of 1 to 10, Plaintiff rated her pain on the day of the hearing as "[p]robably a 5."  <u>Id.</u>

Plaintiff also presented testimony by her former employer, Wayne Pittman.  Mr. Pittman testified that he employed Plaintiff as a graphic artist for approximately 15 years until November 2006.  Plaintiff's job was to use a computer to run graphics, she "prepped them and applied them to signs."  <u>Id.</u> at 25, R. 46.  Mr. Pittman testified that a couple of years before Plaintiff left his employment,

> [S]he got to where she was having trouble with her eyesight, couldn't see, was having balance problems, couldn't stay on her feet for periods of time, was having trouble with her hands cramping up, couldn't hold the tools, and she was having to be absent a lot because of doctor's appointments and just wasn't able to come to work.

<u>Id.</u> at 26, R. 47.  Mr. Pittman attempted to accommodate Plaintiff by modifying one of the work tables so that Plaintiff could do her work sitting down, but "after [a]while, I had to take her off . . . operating the computer because she couldn't . . . read the computer screen[.]"  <u>Id.</u>  He also modified some of Plaintiff's work tools, to make them easier for Plaintiff to hold.  <u>Id.</u>  He would let Plaintiff stay at the shop when he went out to do on-site jobs because he was afraid that, because of Plaintiff's balance problems, she might get injured.  <u>Id.</u>  Mr. Pittman testified that he saw Plaintiff fall at work on one occasion and "she sometimes would . . . get off balance and have to grab tables to keep from falling and a couple of times, walked into a wall."  <u>Id.</u>  Mr. Pittman also tried to accommodate Plaintiff near the end of her employment by having her answer the telephone, "but then she started having trouble with her voice and sometimes she could barely talk[.]"  <u>Id.</u> at 27, R. 48.  He testified that they also tried to accommodate Plaintiff by putting her on a part-time schedule "I think it was going to be 24 hours a week," but after doing that for a few months "she started having problems with that schedule too."  <u>Id.</u>  Mr. Pittman testified that he felt that Plaintiff "always gave her best

44

effort," but she just couldn't work.  Id.

The last witness to testify at the hearing before the ALJ was Dr. Roy Sumpter, a vocational

expert (the "VE").  Id. at 27, R. 48.  The ALJ posed several hypothetical questions to the VE.  First,

the ALJ instructed,

> For hypothetical one, I want you to assume the individual was now 38 years old, has
> a high school education or better, work history as documented and testified to.  I want
> you to assume further that this individual be limited to light work as defined in 21F
> exertionally . . . and there would [be] . . . additional postural limitations.  She can
> never climb a ladder, rope, or scaffold.  She can occasionally climb a ramp or stairs,
> occasionally . . . balance . . . and frequently perform all over postural activities and
> based on 19F, her mental impairment would be not severe.  I don't believe then she
> could do any of her post work based on the exterional demands alone but would
> there be other work available to her under this hypothetical in the regional and
> national economy?

Id. at 29–30, R. 50–51.  The VE testified that Plaintiff could perform the jobs of cashier, office

helper, and mail clerk.  Id. at 30, R. 51.  Next, the ALJ asked,

> What if I were to modify this hypothetical somewhat . . . .  Again, this individual
> exertionally could  perform light work.  There would be postural limitations.  She
> should never climb a ladder, rope, or scaffold, occasionally perform all of the
> postural activities and there would be environmental limitations.  She should avoid
> even moderate exposure to hazards.  Could she perform any of these jobs that you've
> mentioned before in the same numbers or any other work or no work?

Id.  The VE testified that he believed that Plaintiff could perform the jobs that he listed before.  Next,

the ALJ asked,

> What if I were to add . . . an additional limitation that exertionally, she'd be limited
> to sedentary work, as defined in the social security regulations?  In other words,
> sedentary exertionally, never climb ladders, ropes, or scaffolds, occasionally perform
> other postural activities environmentally avoid even moderate exposure to hazards.
> Would there be any sedentary jobs available for such an individual in the regional
> and national activity?

Id. at 31, R. 52.  With these additional limitations, the VE testified that Plaintiff could perform

several jobs, giving as examples a telephone information clerk, a sedentary table worker, and a callout operator. Id. The ALJ then asked, "[I]f I were to find that this individual . . . had additional limitations of simple routine, repetitive tasks of unskilled work, . . . would she still be able to do these jobs?" Id. The VE responded that, "These jobs generally are considered simple routine repetitive[.]" Id. at 32, R. 53. Lastly, the ALJ asked,

> [I]f I were to find for an individual the same age, educational, work experience from hypothetical 1, that based on . . . Dr. Hamberis' assessment that this individual could not even perform a full range of sedentary work, would there be any work for such an individual in the regional or national economy?

Id. at 32, R. 53. The VE responded that, assuming from the hypothetical that the individual could not work an eight-hour shift, there would not be any work for such an individual in the regional or national economy. Id. at 33, R. 54.

## C.    ALJ's Decision

The ALJ made the following findings in his decision denying benefits:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.    The claimant has not engaged in substantial gainful activity since November 8, 2006, the alleged onset date (20 CFR 404.1571 et seq. and 416.917 et seq.).

3.    The claimant has the following severe impairment: fibromyalgia (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1526, 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). I specifically find that she can lift or

carry 20 pounds occasionally and 10 pounds frequently, and she can sit, stand, or walk for six hours, each, of an eight hour work day. I also find that she can never climb a ladder, rope, or scaffold, but she can occasionally balance, stoop, kneel, crouch, crawl, and climb a ramp or stairs. I also find that she needs to avoid even moderate exposure to workplace hazards such as moving machinery and unprotected heights.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on March 22, 1970 and was 36 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 8, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. 12–21.

The ALJ's decision advised that he had considered all of Plaintiff's symptoms to the extent they could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. R. 18. The ALJ noted that, at the hearing, Plaintiff "described herself as extremely limited, as she has to the lengthy list of treating, examining, and consulting physicians in the record." Id. However,

47

"after sorting through the extensive evidence in the record," the ALJ "found the objective results are repeatedly normal." Id.  For example, "[a]t the Mayo Clinic in August 2007, [Plaintiff] underwent some of the most extensive and comprehensive diagnostic testing I have seen in a disability case, which revealed that she is quite healthy." Id.

The ALJ considered Plaintiff's testimony, but found her to be "less than credible regarding her subjective complaints." Id.  For example, the ALJ noted that he was "surprised at [Plaintiff]'s testimony that she is a candidate for lumbar surgery, but that it would not be performed due to 'muscle problems.'" Id.  The ALJ observed that there is no indication in Plaintiff's medical records or Dr. Hamberis' questionnaire that Plaintiff needs surgery and "a 'muscle problem' has been completely ruled out in this case." Id.  Similarly, the ALJ observed that, while Plaintiff testified that she suffers from disabling depression and anxiety, "Dr. Myer's mental assessment was remarkably normal, to the extent that I have found no 'severe' mental impairment in this case." Id. at 19.  The ALJ also noted discrepancies between Plaintiff's claims about her physical limitations and her testimony about her daily activities.  Id.  The ALJ further found that "[t]he record shows that her complaints of pain tend to change once a diagnosis is ruled out. . . . she has demonstrated poor effort on extremity strength testing . . . and she has not taken physical and occupational therapy seriously, as shown by her absentee rate." Id. at 18–19.

The ALJ stated that he is "struck by the overall puzzlement, again and again, by treating and consulting physicians in this case." Id. at 19.  The ALJ considered Dr. Hamberis' "questionnaire responses which suggest that the claimant cannot even perform sedentary work," but found this assessment not due controlling weight, applying SSR 96-2p, noting in particular that such assessment was not supported by Dr. Hamberis' own treatment notes and "the other voluminous evidence in the

48

record contradicts his assessment." Id. The ALJ also considered the testimony of Mr. Pittman and although the ALJ "found him to be sincere, . . . I cannot reconcile his observations or the claimant's complaints with the objective medical findings." Id.

## II. STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes a de novo review of the factual circumstances that substitutes the Court's findings for those of the Commissioner. Vitek v. Finch, 438 F.2d 1157 (4th Cir. 1971). The Court must uphold the Commissioner's decision as long as it is supported by substantial evidence. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." Flack v. Cohen, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational." Vitek, 438 F.2d at 1157-58.

The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). However, the Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the

record as adequate to support that determination.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).

## III.  <u>THE APPLICABLE LAW AND REGULATIONS</u>

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a).  Disability is defined in 42 U.S.C. § 423(d)(1)(A) as: "[the] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Social Security Act has, by regulation, reduced the statutory definition of "disability" to a series of five sequential questions that are to be asked during the course of a disability determination.  The five questions are: (1) is the claimant engaged in substantial gainful activity; (2) does the claimant have a severe impairment or combination of impairments; (3) does the claimant have an impairment that meets or equals one of the listings in the appropriate appendix; (4) is the claimant prevented by the impairment or combination of impairments suffered from engaging in his or her relevant past employment; and (5) does the claimant have the ability to engage in other gainful activity considering his or her age, education, past relevant experience, and residual functional capacity.  <u>See</u> 20 C.F.R. § 404.1520 (2007).  An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work.  In such a case, no further inquiry is necessary.

//

//

//

## IV. <u>DISCUSSION</u>

**A.     The ALJ's Failure To Find Plaintiff's Knee Impairments, Vocal Cord Dysfunction and Chronic Pain "Severe" Impairments**

Plaintiff objects to the ALJ's failure to find that Plaintiff's knee impairments, vocal cord dysfunction and chronic pain are "severe" impairments. Pl.'s Obj. 19, ECF No. 42. Plaintiff made this same argument in her brief submitted to the Magistrate Judge and the R&R throughly discusses this objection before dismissing it. <u>See</u> R&R 7–8, ECF No. 37. Plaintiff's objection on this basis fails to specifically object to any part of the R&R; indeed, in discussing this objection, Plaintiff's brief makes no mention of the R&R at all. <u>See</u> Pl.'s Obj. 19–23, ECF No. 42. Nevertheless, the Court has independently and thoroughly reviewed the record and finds, for the reasons set forth in the R&R, that this objection is without merit.

**B.     The ALJ's and Magistrate Judge's Assessment of Plaintiff's Residual Functional Capacity ("RFC")**

Plaintiff also renews her complaint that the ALJ failed to perform a sufficient residual functional capacity ("RFC") analysis. Specifically, Plaintiff argues (1) "the ALJ failed to consider the limitations resulting from the 'one' impairment he did find to be 'severe,' the fibromyalgia," (2) "[t]he ALJ failed to properly consider and articulate the evaluation of <u>all</u> of [Plaintiff]'s medical impairments," and (3) "the ALJ and Magistrate [improperly] dismiss the opinion of [Plaintiff]'s primary treating physician, Dr. Hamberis," which Plaintiff argues is entitled to "controlling weight." Pl.'s Obj. 25, 30, 31, ECF No. 42.

The Magistrate Judge addressed these complaints in detail in the R&R. R&R 9–13, ECF No. 37. After carefully reviewing the record, the Court agrees with the Magistrate Judge's recommended disposition of these arguments. Accordingly, Plaintiff's objections related to the ALJ's assessment

of Plaintiff's RFC are overruled.

## V.  <u>CONCLUSION</u>

After a thorough review of the Report and Recommendation and the record in this case, the court hereby overrules Plaintiff's objections and adopts Magistrate Judge Hendrick's Report and Recommendation and incorporates it herein.  The Commissioner's decision is, therefore, affirmed.

**IT IS SO ORDERED.**

<u>/s/ Margaret B. Seymour</u>
Margaret B. Seymour
United States District Judge

March 29, 2011
Columbia, South Carolina